# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL MORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) C.A. No. 12110-VCG | |
| | ) | |
| SPECTRA ENERGY PARTNERS (DE) GP, LP; SPECTRA ENERGY CORP | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SPECTRA ENERGY PARTNERS, LP, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 12, 2017
Date Decided: June 27, 2017

Stuart M. Grant, Michael J. Barry, Michael T. Manuel, of GRANT & EISENHOFER P.A., Wilmington, Delaware; Peter B. Andrews, Craig J. Springer, of ANDREWS & SPRINGER LLC, Wilmington, Delaware; OF COUNSEL: Jeremy Friedman, Spencer Oster, David Tejtel, of FRIEDMAN OSTER & TEJTEL PLLC, New York, New York, *Attorneys for Plaintiff.*

Edward P. Welch, Jenness E. Parker, Bonnie W. David, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Noelle M. Reed, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Houston, Texas, *Attorneys for Defendant Spectra Energy Partners (DE) GP, LP.*

C. Barr Flinn, Tammy L. Mercer, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Karl S. Stern, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, Houston, Texas, *Attorneys for Defendant Spectra Energy Corp.*

GLASSCOCK, Vice Chancellor

When a romantically-involved couple marries, they receive a basket of rights and responsibilities. Their legal duties, up to and including through a death or divorce, are defined by statute and case-law.[1] When couples forgo formal bonds, and pursue connubial pleasures *au naturel*, however, they are free to set their own bounds on the relationship. Behavioral flexibility is increased, of course, but so too is uncertainty, unless their agreements are explicit in a way unusual under the influence of mutual attraction. Litigation in this Court over jointly-owned property is one unfortunate result.

As with romantic parties, so with investing parties. Like a groom, an equity holder buying stock in a Delaware Corporation thereby receives strictures and rights, in that case provided by the Delaware General Corporation Law and a rather vast body of common law, and he can be reasonably confident of what to expect should his relationship with the company and its management and directors become a matter of tears and recriminations.

A buyer of equity in an alternative entity, on the other hand, is free—to the extent the counterparty has agreed—to set the terms of the relationship as the parties find satisfactory. Again, flexibility is enhanced, but uncertainty may lurk unless the express terms of the relationship—the terms of the entity agreement—are both clear

---

[1] As any long-married person can attest, these legal strictures leave ample room for disagreement, negotiation and compromise in the nature of the relationship.

1

and understood by the investor. If the relationship grows less than affectionate, it is frequently the terms of that contract, and not corporate fiduciary duties, that control.

This case presents the latest of many such forays by this Court into the relationships that such parties have created for themselves, here involving a master limited partnership ("MLP") and a conflicted transaction with the MLP's general partner and its parent. Unlike in the corporate setting, where such a transaction would be subject to the strictures of entire fairness review, the parties agreed in advance that they would countenance such conflicted transactions;[2] indeed, the MLP structure is created to accommodate them. Nonetheless, the Plaintiff, a unitholder in the MLP, complains here that a particular self-dealing transaction between the MLP and the parent was unfair on its face. The Defendants have moved to dismiss. The contractual standard for evaluating liability with regard to such transactions, as agreed by the parties, is subjective bad faith, and it is undisputed that the general partner availed itself of a safe-harbor provision that establishes (at least) a rebuttable presumption of good faith. Nonetheless, the fact that the parent of the general partner had already agreed to invest the assets acquired from the MLP with a third party, in a transaction that implied substantially greater value than was paid to the MLP, is sufficient, on these facts and at the pleading stage, to make it reasonably

---

[2] At this juncture, I find it wise to retire the marital metaphor.

conceivable that the general partner acted in bad faith. The Motion to Dismiss, accordingly, is denied in part. My reasoning follows.

## I. BACKGROUND[3]

### A. *The Parties and Relevant Non-parties*

The Plaintiff, Paul Morris, owns common units of Spectra Energy Partners, LP ("SEP" or the "Partnership") and has owned the common units at all relevant times.[4] He brings this action derivatively on behalf of Nominal Defendant SEP.

Nominal Defendant SEP is a Delaware limited partnership whose units trade on the New York Stock Exchange ("NYSE").[5] "SEP is a pipeline and energy transportation company that owns interests in pipeline systems throughout the United States and western Canada."[6] SEP was formed in 2007 by Spectra Energy Corp. ("SE Corp") as an MLP.[7] SEP is managed by Spectra Energy Partners (DE) GP, LP ("SEP GP"), and the board of directors of SEP GP's General Partner, Spectra Energy Partners GP, LLC ("SEP GP LLC").[8] I will adopt the Complaint's shorthand and simply refer to SEP GP and SEP GP LLC together as "SEP GP" for clarity.[9] As

---

[3] The facts, except where otherwise noted, are drawn from the well-pled allegations of Plaintiff's Verified Class Action and Derivative Complaint (the "Complaint" or "Compl.") and exhibits or documents incorporated by reference therein, which are presumed true for purposes of evaluating the Defendants' Motions to Dismiss.
[4] Compl. ¶ 11.
[5] *Id.* at ¶ 12.
[6] *Id.* at ¶ 22.
[7] *Id.* at ¶ 12.
[8] *Id.* at ¶¶ 13, 23.
[9] *See id.* at ¶ 13 n.1.

an MLP "SEP has no officers, directors or employees. Instead, it is managed by SEP GP and the SEP GP Board of Directors."[10]

Defendant SEP GP is a Delaware limited partnership and the general partner of SEP.[11] SEP GP is "a wholly owned subsidiary of SE Corp" and SEP, as noted above, is controlled by its general partner SEP GP, LLC, a Delaware limited liability company.[12]

Defendant SE Corp is a Delaware corporation and is the ultimate parent of SEP GP.[13] SE Corp is a $33 billion energy infrastructure company, that is listed on the NYSE.[14] "As of September 30, 2015, SE Corp owned an approximate 80% equity interest in SEP."[15] SE Corp's Chairman, President and CEO is a director of SEP GP and also the CEO and Chairman of SEP GP.[16] Other high-ranking SE Corp employees and former employees also sit on SEP GP's board.[17]

To recapitulate: The Plaintiff is a unit holder in an MLP. SEP is the MLP, managed by its General Partner SEP GP. SEP GP is a wholly owned subsidiary of SE Corp. Further, SEP is managed by SEP GP LLC's board of directors. As mentioned above, SEP GP LLC is combined with SEP GP for clarity here and

---

[10] *Id.* at ¶ 23.
[11] *Id.* at ¶ 13.
[12] *Id.*
[13] *Id.* at ¶ 14.
[14] *Id.*
[15] *Id.*
[16] *Id.* at ¶ 15.
[17] *See id.* at ¶¶ 16–19.

4

referred to as SEP GP or the "General Partner." SE Corp formed SEP, and is the ultimate parent of SEP GP. Further, SE Corp owns approximately 80% of the equity in SEP. The general relation among these entities is depicted in the figure below:



Non-party Simmons & Company International ("Simmons") provided financial advice to the Conflicts Committee regarding the challenged transaction.[18]

B. *The Challenged Transaction*

The transaction at issue is a "reverse dropdown"[19] between SE Corp and SEP whereby SE Corp obtained a one-third interest in the two pipeline companies from

---

[18] *Id.* at ¶ 38.

[19] A "dropdown" refers to a transaction in which an MLP purchases assets from its general partner or a related entity. Occasionally, as is the case here, an MLP may sell assets back to its general partner or a related entity in a so-called "reverse dropdown." *See id.* at ¶ 26.

SEP that SE Corp had already publicly promised to contribute to a joint venture with a third party at an implied value of $1.5 billon. According to the Complaint, SE Corp actually tendered to SEP consideration valued at under $1 billion.

DCP Midstream LLC ("DCP"), formed in 2000, is a fifty-fifty joint venture between SE Corp and Phillips 66.[20] DCP was formed for the purpose of developing two pipeline companies: DCP Sand Hills Pipeline, LLC ("Sand Hills") and DCP Southern Hills Pipeline, LLC ("Southern Hills").[21] Prior to September 2015, SEP, Phillips 66, and DCP each owned one third interests in the Sand Hills and Southern Hills companies.[22]

On September 8, 2015, SE Corp and Phillips 66 announced in a press release that the two companies would each contribute assets to DCP to address DCP's financial needs "amid a downturn in the energy sector" (the "Joint Contribution").[23] The press release stated that Phillips 66 would contribute $1.5 billion in cash, and SE Corp would contribute "'its ownership interest' in Sand Hills and Southern Hills."[24] A September 9, 2015 Fitch Ratings article on the Joint Contribution reported that SE Corp and Phillips 66 "announced that they have agreed to make a $3 billion asset contribution to their 50/50 JV DCP" and described SE Corp's

---

[20] *Id.* at ¶ 31.
[21] *Id.* at ¶¶ 2, 31.
[22] *Id.* at ¶ 31.
[23] *Id.* at ¶¶ 31–32.
[24] *Id.* at ¶ 32.

6

contribution as a "$1.5 billion asset contribution."[25]  Further, a November 2015

investor presentation by DCP also characterized the Joint Contribution as $3 billion

of cash and assets contributed to DCP.[26]  In addition, at a November 4, 2015 analyst

conference call, SE Corp's CFO described SE Corp's contribution of its interests in

the pipeline companies as "'matching' Phillips 66's $1.5 billion cash contribution."[27]

Simmons, the Conflicts Committee's financial advisor, visually depicted the Joint

Contribution as set out below:[28]



As alluded to above, SE Corp did not own the Sand and Southern Hills assets

it promised to transfer when it announced the Joint Contribution on September 8,

2015.  In November 2013, SE Corp had transferred its one third interests in Sand

Hills and Southern Hills, which it held at the time, to SEP in a dropdown

---

[25] *Id.* at ¶ 57.

[26] *Id.* at ¶ 58.

[27] *Id.*

[28] *See id.* at ¶ 47; June 13, 2016 Transmittal Affidavit of Bonnie W. David, Esquire ("David Aff.") Ex. 3 at SEP0155.  PSXP in the figure means Phillips 66 Partners LP, and SE means SE Corp. *See id.*

transaction.[29]  Thus, to effectuate the promised contribution to DCP, SE Corp first had to obtain the assets back from SEP in a reverse dropdown transaction.[30]

On September 4, 2015, SE Corp sent a letter to SEP GP proposing a transaction (the "Transaction") in which SEP would transfer its interests in Sand Hills and Southern Hills to SE Corp in exchange for SE Corp (through its affiliates) (i) returning "20 million SEP limited partner units to SEP for redemption" (the "LP Unit Redemption") and (ii) waiving "its right to receive up to $4 million" in Incentive Distribution Rights ("IDRs") per quarter for twelve quarters (the "IDR Give-back").[31]  On September 7, 2015, pursuant to the Agreement of Limited Partnership (the "LPA"), the SEP GP directors authorized the establishment of a Conflicts Committee (the "Committee") to evaluate the Transaction and appointed two independent directors to the Committee.[32]  The written consent establishing the Committee (the "Written Consent") contained several recitals, most relevant from the Plaintiff's prospective is the following:

> WHEREAS, the Company has received a formal non-binding proposal from Spectra Corp in which Spectra Corp has proposed that the Partnership transfer its membership interests in Sand Hills and Southern Hills to Spectra Corp in exchange for certain consideration from Spectra Corp to the Partnership, *with the aim of holding the Partnership net cash neutral* (the 'Transaction').[33]

---

[29] Compl. ¶ 33.
[30] *Id.* at ¶¶ 33–34.
[31] *Id.* at ¶ 34.
[32] *Id.* at ¶¶ 35–36.
[33] *Id.* at ¶ 36 (emphasis supplied in the Complaint); David Aff. Ex. 2.

As discussed later, the Plaintiff argues this recital improperly restrained the Conflicts Committee from pursuing a transaction in the best interest of the Partnership, and rendered the "'Special Approval' process ineffective."[34] The Committee met and discussed the Transaction on September 8, 2015.[35] That same day, the Committee retained McGuireWoods LLP as legal advisor and Simmons as financial advisor.[36]

Simmons' initial presentation to the Committee (the "September Presentation"), allegedly recognized that "SE Corp would immediately flip these assets to DCP in a transaction that valued" the interests in the two pipeline companies at $1.5 billion.[37] Simmons also initially identified three "components of value" that SEP would receive as "consideration": (1) the LP Unit Redemption valued at $832 million; (2) the IDR Give-back valued at $53 million; and (3) "Reduced GP Cash Flow" or "Reduced GP Distributions" which Simmons valued at $575 million.[38] The "Reduced GP Distributions," a component not itself offered as consideration in SE Corp's opening offer, was described by Simmons to be the "reduced distributions from SEP [to SEP GP] after the sale of Sand Hills and

---

[34] Compl. ¶ 37.
[35] *Id.* at ¶ 38.
[36] *Id.*
[37] *Id.* at ¶ 41.
[38] *Id.* The Reduced GP Distribution number was later clarified to be $525 million in Simmons' October 2015 presentation to the Committee. *See* David Aff. Ex. 3 at SEP0195.

9

Southern Hills."[39]  Pursuant to the LPA, as SEP met certain distribution targets an increased proportion of cash flows were contractually obligated to be distributed to SEP GP.  The "Reduced GP Distributions" in question were expected reductions in future payments from SEP to SEP GP as SEP became less profitable upon the removal of the assets.[40]  Accordingly, Simmons initially calculated the "*Value* of Total Consideration" to be $1.46 billion, which was "essentially on par with SE Corp's expected benefit from flipping the assets to DCP."[41]

Subsequent to its September Presentation to the Committee, Simmons allegedly "changed tack" and focused more on the value of LP Unit Redemption and the IDR Give-back in later analyses of the consideration to SEP.[42]  Nevertheless, the Complaint alleges that "'Reduction of GP Cash Flow' remained a focal point in the Committee's consideration and ultimate approval of the Transaction itself."[43]

From September 8 to October 7, 2015, the Committee met six times to consider the Transaction, and on October 7, 2015, the Committee recommended

---

[39] Compl. ¶ 42.

[40] Or as the Defendants argue at times, upon cancellation of the various units.

[41] *Id.* at ¶ 41 (emphasis added).

[42] *Id.* at ¶ 44.  I note, however, from a cursory review of the documents incorporated by reference it is not clear an actual change in tack occurred in the October Presentation—it appears that Simmons started delineating between consideration actually to be *transferred* to SEP unitholders as part of the Transaction and the *value* to SEP of the Transaction.  *See, e.g.*, David Aff. Ex. 3 at SEP0192 (concluding that "[t]otal LP consideration value of $946 million is accretive to SEP"); *id.* at SEP0195 (stating in an appendix to the October Presentation that the "Total Value of Consideration" was $1.471 billion when $525 million in "Reduced GP Cash Flow" is included).

[43] Compl. ¶ 44.

10

approval of the Transaction to the full board of SEP GP.[44] On October 8, 2015, the SEP GP board approved the Transaction based upon the Committee's recommendation.[45]

The final terms of the Transaction provided that SEP would transfer its interest in Sand Hills and Southern Hills to subsidiaries of SE Corp in exchange for (i) 21.56 million LP Units and 440,000 GP Units, and (ii) a reduction in IDRs payable to SEP GP of "$4 million per quarter through September 30, 2018."[46] Thus, the Committee had successfully bargained for some additional consideration beyond SE Corp's initial offer: SE Corp added to its initial proposal the redemption of 440,000 GP Units (the "GP Unit Redemption"), along with approximately 1.56 million additional LP Units. The "Reduced GP Distributions," a component of *value* to SEP in Simmons' September Presentation, was not explicitly included in the final terms of the Transaction.

In an October 2015 presentation to the Committee (the "October Presentation"), Simmons calculated the value of the LP Unit Redemption at $41.95 per unit (the market price of the units as of October 6, 2015) which totaled $904

---

[44] *Id.* at ¶ 45.

[45] *Id.* The Complaint mentions that "there was a buyer in the marketplace that apparently valued these assets $500 million above what SE Corp paid SEP for them." *Id.* at ¶ 56. The Plaintiff, however, did not name any actual third party buyer that was engaged in the sale process. The only reasonable inference is that the "buyer in the marketplace" refers to Phillips 66 that contributed $1.5 billion cash to DCP in the Joint Contribution.

[46] *Id.* at ¶ 46.

million.[47] Simmons then ascribed $42 million to the IDR Give-Back—that is, the cancellation of quarterly distribution rights associated with the IDRs.[48] However, Simmons did not assign any value to GP Unit Redemption.[49] With respect to SEP's one-third interests in Sand Hills and Southern Hills, Simmons concluded that the value *to the limited partners* was $700 to $800 million "implied by comparable companies" and $750 to $875 million under a discounted cash flow analysis.[50] Based on these valuations, Simmons opined that "[t]otal LP *consideration* value of $946 million is accretive to SEP."[51] The Committee accepted the deal at this amount of actual consideration aware of the implied and announced market price of the

---

[47] *Id.* at ¶ 50; David Aff. Ex. 3 at SEP0184.

[48] Compl. ¶ 50; David Aff. Ex. 3 at SEP0185.

[49] Compl. ¶ 50. The 440,000 general partner units cancelled as part of the Transaction was allegedly "a product of keeping SE Corp's 2% GP interest constant when reducing the number of outstanding LP units" as a result of the LP Unit Redemption. *Id.* at ¶ 63. Historically, SEP has allowed SE Corp to "acquire additional GP units at the same price as LP units as necessary in order to maintain a 2% general partnership interest in SEP." *Id.* The general partner units were thus implicitly valued on par with the limited partner units. Since Simmons valued the limited partner units in the LP Unit Redemption at $41.95 per unit, the implied valuation of the 440,000 general partner units would be, at most, roughly $18,458,000. *Id.*; Nov. 15, 2016 Oral Argument Tr. 13:12–15. Whether or not the GP Unit Redemption was properly excluded from Simmons' estimate of the total value of consideration is not material to this dispute at the pleading stage.

[50] Compl. ¶ 51; David Aff. Ex. 3 at SEP0192. I note that Simmons also gave a "suggested valuation range" between $950 million and $1,150 million in its final presentation to the Committee. Compl. ¶ 49; David Aff. Ex. 3. at SEP0176. However, when Simmons ultimately opined that the LP consideration was accretive to SEP, it compared the estimates of the LP consideration with the numbers from the DCF and comparable companies analyses, rather than the alleged market-recognized value of the flip of the assets of $1.5 billion. *See* David Aff. Ex. 3 at SEP0192.

[51] Compl. ¶ 51; David Aff. Ex. 3 at SEP0192.

12

assets of $1.5 billion.[52]  The Complaint alleges that Simmons "specifically *ignored*" the implied $1.5 billion valuation in its determination of fairness.[53]

Notably Simmons did not directly include the "Reduced GP Cash Flow" as part of the "value of consideration to LP" in the October Presentation.[54]  Simmons did indicate—though only in the Appendix of the October Presentation materials—that the "Reduced GP Distributions" were a component of the "total value of consideration."[55]  As compared to the September Presentation,  Simmons allegedly reduced the valuation of the "Reduced GP Distributions" from $575 million to $525 million and clarified that the Reduced GP Distributions arose from both the GP Unit Redemption and the sale of Sand Hills and Southern Hills.[56]  While there is some apparent inconsistency between the Complaint and the briefing in this matter, it appears from the presentations incorporated by the Complaint that the Reduced GP Cash Flows were not included by Simmons, in its final presentation, in the value of the *consideration exchanged* from SE Corp to SEP, but continued to be counted as part of the *total value* of the deal to SEP.[57]

---

[52] *See* Compl. ¶ 48.
[53] *See id.* at ¶ 51 (emphasis in original).
[54] David Aff. Ex. 3 at SEP0183.
[55] *See id.* at SEP0194–95.  The discussion of "Reduced GP Distributions" does not appear in other parts of the presentation materials, including the section titled "Value of LP Consideration."
[56] *Compare id. with* Compl. ¶ 42.
[57] *Compare* David Aff. Ex. 3 at SEP0192 *with id.* at SEP0195.

*C. Most Relevant Provisions of the LPA*

1. Distribution Waterfall of SEP

SEP is organized as an MLP.  MLPs issue publicly traded securities to investors and are typically required by the relevant partnership agreements to "pay out to their unitholders in quarterly cash distributions, all earnings not needed for current operations and maintenance of capital assets."[58]

Section 6.4 of SEP's LPA describes the distribution waterfall for any quarterly operating surplus of SEP.[59]  Under the LPA, any "Available Cash"[60] will be distributed first to SEP GP and the limited partners proportionally to their respective "Percentage Interests" in SEP.[61]  Once certain distribution targets contemplated by the LPA are reached, SEP GP receives, on top of the percentage it is entitled to through its "Percentage Interest," an additional proportion of the incremental cash distribution from the "Available Cash" by way of its IDRs.[62]  In other words, any distribution above the target amounts set by the LPA triggers an obligation to pay SEP GP's IDRs, which in turn consume some portion of the incremental distribution that the limited partners would receive absent the IDRs.  As SEP became more profitable, SEP GP's IDRs would increase.  Conversely, sale of a productive asset

---

[58] *See* Compl. ¶¶ 24–25.
[59] *See* David Aff. Ex. 1 (the "LPA") § 6.4.
[60] A defined term in the LPA that essentially means net quarterly cash on hand less cash reserves for operation of the business.  *Id.* at § 1.1.
[61]  *Id.* at § 6.4.
[62] *See id.*

would, all else equal, reduce future IDR payments.  Again, this is the theoretical basis for Simmons' invocation of the value of "Reduced GP Distributions" inherent in the Transaction.

2. Duty Modification and Conflict of Interest Provisions in the LPA

As is typical in modern alternative entities, Section 7.9(e) of the LPA eliminates common law fiduciary duties and replaces them with contractual standards.[63]

Section 7.9(b) of the LPA imposes a general, overarching, obligation of "good faith" on SEP GP and the Conflicts Committee whenever they "make [a] determination or take or decline to take such other action . . . ."[64]  Under the LPA, in order for a determination to be made in "good faith,"  the person acting "must believe that the determination or other action is in the best interests of the Partnership."[65] That is, subjective good faith is the applicable standard.

Section 7.9(a) of the LPA provides for the "Resolution of Conflicts of Interest" when there is a potential conflict of interest between SEP GP "or any of its

---

[63] *See id.* at § 7.9(e) ("Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner or Assignee and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee.").

[64] *Id.* at § 7.9(b).

[65] Compl. ¶ 30; LPA § 7.9(b).

Affiliates, on the one hand, and the Partnership, any Group Member, any Partner Assignee, on the other."[66] The LPA defines "Affiliates" such that it includes SEP GP and SE Corp.[67]

Section 7.9(a) offers several contractual safe harbors to a conflicted transaction. It states, in part, that any resolution or course of action by SEP GP or its Affiliates in respect of a conflict of interest "shall not constitute a breach of this [LPA] . . . or of any duty stated or implied by law or equity if the resolution or course of action" is (i) approved by "Special Approval," (ii) approved by a vote of the majority of the common units (excluding common units owned by SEP GP and its affiliates), (iii) "on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties," or (iv) "fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership)."[68] The safe harbor utilized in the present litigation is "Special Approval," which is defined in the LPA as an "approval by a majority of the members of the Conflicts Committee."[69] The Conflicts

---

[66] LPA § 7.9(a).
[67] *See id.* at § 1.1 (defining "Affiliate" as follows: "with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question. As used herein, the term 'control' means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise").
[68] *Id.* at § 7.9(a).
[69] *Id.* at § 1.1; Compl. ¶ 29.

Committee, to be contractually compliant, must consist of two or more directors of SEP GP, each of whom must meet the independence and disinterested criteria in the LPA.[70]

Section 7.9(a) provides that the Conflicts Committee is presumed to satisfy the good faith obligation if Special Approval is received.[71] That presumption is rebuttable; Section 7.9(a) places the burden of overcoming the presumption of good faith of the Conflicts Committee upon a person challenging the Special Approval.[72]

Also relevant to this dispute, according to the Defendants, is Section 7.10 of the LPA titled "Other Matters Concerning the General Partner" which provides in subsection (b) that:

> [t]he General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by it, and *any act* taken or omitted to be taken in reliance upon the opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence *shall be conclusively presumed* to have been done or omitted in good faith and in accordance with such opinion.[73]

Thus, Section 7.10 provides a general and broad conclusive presumption of good faith to *SEP GP* when it acts in reliance on professional advisors. Which

---

[70] LPA § 1.1.
[71] *Id.* at § 7.9(a).
[72] *Id.*
[73] *Id.* at § 7.10(b) (emphasis added).

17

presumption applies—the rebuttable presumption of Section 7.9(a), or the conclusive presumption of Section 7.10(b)—is in dispute here.

*D. Procedural Background*

The Complaint pleads six counts, with Counts II, IV, and VI asserting derivative actions that mirror direct claims pled in Counts I, III, and V. However, due to a recent clarification of the law by our Supreme Court, the Plaintiff has abandoned the direct Counts.[74]

Count II asserts breach of the LPA against SEP GP. It alleges that SEP GP breached its "good faith" obligation under the LPA by approving the alleged "patently unfair and unreasonable" terms of the Transaction and by "improperly constraining the Conflicts Committee's authority" to a determination whether the Transaction would hold SEP "net cash neutral" via a whereas clause in the resolution establishing the Conflicts Committee.[75]

Count IV asserts a claim against SEP GP for an alleged breach of the implied covenant of good faith and fair dealing. The Plaintiff makes clear that Count IV is only a gap filler—it becomes relevant if this Court finds that either (i) SEP GP "was not contractually required by the terms" of the LPA to act in good faith, or (ii) reliance on Simmons' fairness opinion "alters the relevant standard of conduct (or

---

[74] *See* Pl's Jan. 13, 2017 Supplement Submission 15 n.28.
[75] Compl. ¶¶ 77–81.

any presumption relating thereto) for purposes of evaluating SEP GP's, the Board's, or the Conflicts Committee's conduct in approving the Transaction."[76] The Plaintiff alleges that SEP GP violated the implied covenant of good faith and fair dealing when it (1) allowed SE Corp to "engineer the Transaction on terms that are patently unfair and unreasonable to SEP," (2) constrained the Committee's authority in considering the Transaction via the net cash neutral whereas clause, and (3) relied on an improper Special Approval and/or Simmons' flawed fairness opinion.[77]

Count VI asserts a claim against SE Corp for tortious interference with the LPA. It alleges that SE Corp has "intentionally caused SEP GP to violate its obligations under the Partnership Agreement by, in bad faith, causing SEP to enter into the Transaction."[78]

Defendants SEP GP and SE Corp each moved to dismiss the respective Counts. The Defendants' Motions were fully briefed and oral argument followed. After oral argument, I asked the parties to submit supplemental briefing on two specific questions: whether SEP's interests in Sand Hills and Southern Hills could have been sold to a third party and if so, whether the proceeds of a third-party sale would be paid out through the LPA's distribution waterfall. This prompted further oral argument on these issues, and no clear resolution. Additionally, in April I

---

[76] *Id*. at ¶¶ 90, 94.
[77] *Id.* at ¶¶ 92–93.
[78] *Id.* at ¶ 106.

requested supplemental submissions on the parties' positions regarding a recent Supreme Court decision pertinent to this matter. Supplemental submissions were received on May 12, 2017. My decision on the Defendants' Motions follows.

## II. ANALYSIS

The Defendants have moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). The standard of review for a Rule 12(b)(6) motion is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[79]

When reviewing a motion to dismiss, the Court may take into consideration documents "incorporated into the pleadings by reference and may take judicial notice of relevant public filings."[80]

Below I review the three remaining Counts of the Complaint: first, that the Transaction breached the LPA; second, that SEP GP breached the implied covenant of good faith and fair dealing, and; third, that SE Corp tortiously interfered with the

---

[79] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[80] *See Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *4 (Del. Ch. Jul. 20, 2007) (citations omitted).

20

LPA and the implied covenant. For the reasons that follow I grant the Defendants'

Motions in part and deny them in part.

*A. The Breach of the LPA Claim*

1. Applicable Standards

It is well settled that the "Delaware Revised Uniform Limited Partnership Act

('DRULPA') gives 'maximum effect to the principles of freedom of contract.'"[81]

The freedom provided by DRULPA "permits the LPA drafter to disclaim fiduciary

duties, and replace them with contractual duties."[82] When "fiduciary duties have

been validly disclaimed, the limited partners cannot rely on traditional fiduciary

principles to regulate the general partner's conduct. Instead, they must look

exclusively to the LPA's complex provisions to understand their rights and

remedies."[83] Such is the case in the LPA here: Section 7.9(e) disclaims common

law fiduciary duties in favor of contractual duties.[84]

When fiduciary duties are disclaimed, "a threshold matter when evaluating a

proposed transaction under the LPA" is what provision of the LPA controls and

---

[81] *Dieckman v. Regency GP LP*, 2017 WL 243361, at *5 (Del. Jan. 20, 2017) (quoting 6 *Del. C.* § 17–1101(c)).

[82] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 2017 WL 1046224, at *7 (Del. Mar. 20, 2017), *as revised* (Mar. 28, 2017) (citation omitted). Consistent with the Supreme Court's characterization of this line of opinions, I will refer to the most recent decision here as "*Brinkerhoff V.*" *See id.* at n.2, n.13.

[83] *Id.* at *7 (citation omitted).

[84] *See* LPA § 7.9(e); *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100–01 (Del. 2013) (finding language similar to Section 7.9(e) disclaimed fiduciary duties).

21

whether the plaintiff has stated a claim that the defendants breached such provision.[85]

To make such a determination, I am to construe the LPA "to give effect to the parties' intent," interpreting words according to their plain meaning "unless it appears that the parties intended a special meaning," and read the LPA as a whole to "give effect to every provision if it is reasonably possible to do so."[86]  Prior precedent often proves unhelpful in this endeavor, and our Supreme Court has repeatedly recognized that the broad contractual freedoms provided by DRULPA necessitate a nuanced look at each particular LPA's provisions.[87]  In LPA's such as this, "investors can no longer hold the general partner to fiduciary standards of conduct, but instead must rely on the express language of the partnership agreement to sort out the rights and obligations among the general partner, the partnership, and the limited partner investors."[88]  To the extent a provision of the LPA is ambiguous, since the limited partners did not bargain for its terms, ambiguities will be interpreted against the general partner, and the Court will give effect to the reasonable expectation of investors.[89]

---

[85] *See Brinkerhoff V*, 2017 WL 1046224, at *8.

[86] *Allen*, 72 A.3d at 104 (citations omitted).

[87] *See, e.g.*, *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1257 (Del. 2016) ("[T]he prevalence of entity-specific provisions in an area of law defined by expansive contractual freedom requires a nuanced analysis and renders deriving 'general principles' a cautious enterprise.").

[88] *Dieckman*, 155 A.3d at 366.

[89] *See, e.g.*, *id.* (explaining "in the case of an ambiguous partnership agreement of a publicly traded limited partnership, ambiguities are resolved as with publicly traded corporations, to give effect to

Here, the Transaction was a reverse dropdown between SEP and SE Corp. SE Corp, as the ultimate parent of SEP GP, is an "Affiliate" of SEP GP under the terms of the LPA. The threshold issue is whether the rebuttable presumption under Section 7.9(a) attaches to the Transaction via Conflicts Committee approval, or as the Defendants suggest, the conclusive presumption of good faith attaches since the Conflicts Committee relied on a financial advisor. For the reasons discussed below, I find that the Transaction is subject to Section 7.9(a), the conflict-of-interest provision under the LPA, rather than the more general provision of Section 7.10(b). Section 7.9(a) provides an optional safe-harbor to satisfy the contractual good faith standard. I find it contrary to the plain terms of the contract and the reasonable expectations of the contracting parties to read the more general provision of Section 7.10(b) to attach here. Therefore, the Defendants are entitled to the rebuttable presumption that they acted in good faith rather than the conclusive presumption of good faith.

Section 7.9(b) imposes on SEP GP and the Conflicts Committee an over-arching obligation to make determinations "in good faith."[90] Section 7.9(b)'s overarching good faith standard is subjective: it defines good faith to mean "the Person . . . must believe that the determination or other action is in the best interests

---

the reading that best fulfills the reasonable expectations an investor would have had from the face of the agreement") (citations omitted).

[90] LPA § 7.9(b).

of the Partnership."[91]  The question for purposes of Defendants' Motions is whether the Plaintiff has alleged sufficient facts to make it reasonably conceivable that SEP GP, with the presumption of good faith provided by its satisfaction of a safe harbor provided by Section 7.9(a), has nonetheless breached its contractual "good faith" obligation in regards to the Transaction.  For the reasons that follow, I find the Complaint pleads facts, which together with all reasonable inferences therefrom provide at least one "reasonably conceivable set of circumstances susceptible of proof" upon which the Plaintiff could recover.[92]

### 2. Section 7.10(b)'s Conclusive Presumption is Inapplicable Here

SEP GP argues that Section 7.10(b) establishes a "conclusive presumption" that the approval of the Transaction was in good faith because the Conflicts Committee relied on the Simmons' fairness opinion, and SEP GP relied on the Conflicts Committee.[93]  According to SEP GP, the plain language in Section 7.10(b), which provides the general partner with a conclusive presumption of good faith where it acts in reasonable reliance on certain professional opinions,[94] leaves no

---

[91] *Id.*; *see Allen*, 72 A.3d at 104.

[92] *See Savor*, 812 A.2d at 897.  While actually proving subjective bad faith is a steep climb, that is not a relevant consideration at the pleading stage.

[93] *See* SEP GP's Opening Br. 10–11.

[94] *See* LPA § 7.10(b) ("The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by it, and any act taken or omitted to be taken in reliance upon the opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.").

room to rebut the presumption with "substantive attacks on an advisor's methodology."[95] The Plaintiff counters that Section 7.10(b) is inapplicable as a more general provision of the LPA that "cannot logically apply to conflict-of-interest transactions" governed by the more specific provision of Section 7.9.[96] To support this interpretation, the Plaintiff invokes the principle of contract construction that specific provisions of a LPA control over the more general ones.[97] The Defendants counter that this contractual construction aid only applies when there is a conflict between two provisions, and this aid need not be invoked because there is no conflict between the provisions. According to the Defendants, Section 7.9(a) and Section 7.10(b) can be read in harmony.[98]

It is helpful to note how Section 7.9(a) and Section 7.10(b) interact with one another. On its face, Section 7.10, entitled "Other Matters Concerning the General Partner," appears to cover all matters related to SEP GP that *other* sections of the LPA do not address.[99] Reaching safe harbor in conflict transactions *is* explicitly laid out in another section: Section 7.9(a) specifically sets forth safe harbors in conflicts

---

[95] SEP GP's Opening Br. 15.
[96] Pl's Answering Br. 31.
[97] *See id.* at 32–33 (quoting *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005); *Wood v. Coastal Gas Corp.*, 401 A.2d 932, 941 (Del. 1979)).
[98] SEP GP's Reply Br. 6–7 (quoting *DCV Holdings.*, 889 A.2d at 961 ("[W]here specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.")).
[99] LPA § 7.10. (emphasis added). I make this observation aware of the provision in the LPA that specifically disclaims reliance on titles in construing the document and that titles are in the LPA "for reference purposes only . . . ." *See id.* at § 1.2.

situations and grants a rebuttable good faith presumption if a safe harbor is met. The language and structure of the agreement implies that the "good faith" presumption in conflicts situations is intended to be rebuttable, and not as SEP GP insists, "conclusive." Further, as the Plaintiff correctly points out, "the settled rules of contract interpretation" counsel the Court to prefer Section 7.9(a), a specific provision, over the more general Section 7.10.[100]

The Defendants argue, however, that the perceived linguistic conflicts between Section 7.9(a) and Section 7.10(b) should be viewed as more apparent than real. Section 7.10(b) could be read to afford *additional* protection to SEP GP when a Conflicts Committee seeks guidance from advisors, thus *heightening* the Plaintiff's burden in overcoming the good faith presumption resulting from a Special Approval.[101]

---

[100] *See Brinkerhoff V*, 2017 WL 1046224, at *9 (providing that the Court should "prefer specific provisions over more general ones") (citations omitted).

[101] In other words, the Defendants urge a reading that Section 7.10(b) supplements the safe harbor when advisors are involved in the Special Approval process, a matter not otherwise contemplated by Section 7.9(a).

SEP GP cites cases where courts favored a conclusive presumption when clauses resembling Section 7.10(b) were at issue.[102]  Principally,[103] they rely on *Norton v. K-Sea Transp. Partners L.P.*,[104] in which the Supreme Court found that a contractual provision generally providing an irrebuttable presumption of good faith upon reliance on professional advice trumped a specific and otherwise applicable provision with a rebuttable presumption.  *Norton* is undoubtedly on point.  I am not, however, persuaded that the case is dispositive to the issue under the LPA present here.  The LPA provisions here, I note, are very similar to those presented in a subsequent Supreme Court case, *Allen v. Encore Energy Partners, L.P.*[105]

The Supreme Court in *Allen* stated the precise issue before me, i.e. whether a general conclusive presumption of good faith arising from reliance on advisors

---

[102] *See, e.g.*, *Gerber v. Enterprise Products Holdings, LLC*, 67 A.3d 400, 419–20 (Del. 2013) *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013) (stating "LPA Section 7.10(b)'s conclusive presumption must be read together with" the contractual fiduciary duty to act in good faith under Section 7.9(b) but holding that Section 7.10(b)'s conclusive presumption nonetheless does not bar *an implied covenant claim*); *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 367 (Del. 2013) (applying a conclusive presumption of good faith under a provision similar to Section 7.10(b) to a conflict of interest transaction).  I note that in *Norton*, the effect of the General Partner's "approval merely triggered submission of the Merger to the unitholders for a majority vote." *Norton*, 67 A.3d at 368.  The decision of the General Partner which was challenged, its reliance on a fairness opinion in approving the merger, had the effect of submitting the transaction to a vote whereby a majority of the unitholders voted to consummate it. The Court observed that unitholders who were dissatisfied with the terms had a remedy at "the ballot box, not the courthouse." *Id.* at 368 (citations omitted).  That is not analogous to the situation here.
[103] *See* SEP GP's Reply Br. 1–2, 8–9; *see also* SEP GP's May 12, 2016 Supp. Br. 4.
[104] 67 A.3d 354 (Del. 2013).
[105] *See* 72 A.3d 102–104 (Del. 2013).  I note the *Allen* decision was issued *after* both *Gerber* and *Norton*.

27

trumped the specific conflict provision's *rebuttable* presumption of good faith.[106]

The *Allen* Court recognized the holding in *Norton*,[107] and *Gerber v. Enterprise Products Holdings, LLC*,[108] (which reached a conclusion similar to that in *Norton*), but also cited to a trial court ruling contrary to *Norton* and *Gerber*,[109] and ultimately avoided a decision on the issue.[110] *Allen*, to my mind, indicates that our Supreme Court does not intend that *Norton* be construed as a totemic statement that general provisions of irrebuttable good faith, in all instances, overcome specific clauses to the contrary. As I read the case law, there is no binding authority that *this LPA* requires Section 7.10(b)'s conclusive presumption be read to alter the standard under Section 7.9(a). I note that it is not clear that the LPAs in the cases the Defendants rely upon were identical, in all important respects, to the governing document here.[111]

I find helpful a recent case of this Court. The Defendants relied heavily in briefing[112] upon *Employees Retirement System of City of St. Louis v. TC Pipelines*

---

[106] *Id.* at 103–04.
[107] *See id.* at 103 n.34; *see also id.* (recognizing the holding in *Gerber* attaching the general conclusive presumption of good faith when the action was taken in reasonable "reliance on the investment banker's opinion").
[108] *Id.* at 103 (citing *Gerber,* 67 A.3d 400, 418–21).
[109] *Id.* at 103 n.35.
[110] *Id.* at 103–04. The Court found no need to reach the issue whether Section 7.9(a)'s rebuttable presumption or Section 7.10(b)'s conclusive presumption applied because the plaintiff failed to plead facts indicating a lack of good faith. *See id.*
[111] *See, e.g., id.* at 100 (observing that while a series of MLP cases have been reviewed by the Supreme Court, the "precise language" of each agreement needs to be analyzed because "facial similarities can conceal significant differences between the limited partnership agreements").
[112] *See* SEP GP's Opening Br. 2–3, 11–15.

*GP, Inc.*,[113] which tends, however, to my mind illustrate a weakness with the Defendants' position here. In *TC Pipelines*, the conclusive presumption was contained *within* the special approval safe-harbor.[114] That is, the LPA in *TC Pipelines* specifically provided that valid special approval by a conflicts committee of a conflicted transaction invoked a conclusive presumption of good faith.[115] This Court held such a conclusive presumption barred judicial review of a breach of the LPA claim, and the Supreme Court affirmed on that ground.[116] Here, the conclusive presumption sought to be invoked is not within the Conflicts Committee portion of the LPA, rather it is in a separate provision referring generally to "other matters" concerning the General Partner. The Defendants encourage me to apply the conclusive presumption of good faith in favor of the General Partner, due to the Committee's reliance on Simmons as a financial advisor. I decline that reading: what *TC Pipelines* tends to demonstrate, to my mind, is that when sophisticated entities intend to provide a conclusive presumption in a conflicts situation, they know how to draft such a provision.[117]

---

[113] 2016 WL 2859790 (Del. Ch. May 11, 2016), *aff'd sub nom. Employees Ret. Sys. of the City of St. Louis v. TC Pipelines GP, Inc.*, 152 A.3d 1248 (Del. 2016).

[114] *TC Pipelines*, 2016 WL 2859790, at *4.

[115] *Id.* at *4–5.

[116] *See TC Pipelines*, 152 A.3d 1248 (Del. 2016).

[117] I note another case cited by the Defendants also appears to illustrate this point, to my mind. *See* SEP GP's Opening Br. 13 (citing *Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 2016 WL 912184, at *1 (Del. Mar. 10, 2016) for the proposition that the Court will enforce conclusive presumptions). Like *TC Pipelines*, the conclusive presumption upon which the Supreme Court affirmed in *Haynes Family Trust* appeared to be nested directly in the conflict of interest resolution

Here the conclusive presumption is absent from the conflicts safe-harbor section of the LPA. To the extent there is any ambiguity regarding the presumption that should apply here, our case law teaches that because of the nature of these entities and their broad contractual freedoms, coupled with the unitholders' limited bargaining power and the fact that the unitholders' sole protections flow from the text of the LPA, ambiguities should be resolved in favor of the unitholder.[118]

Here, I find the reasonable expectation of an investor reading the plain language of this LPA requires the attachment of the rebuttable good faith presumption provided by Section 7.9. Under the Defendants' reading of the LPA, the conflicted General Partner would be better situated in a conflicts situation by eschewing review by an independent committee in favor of unilaterally hiring an investment banker. Assuming the banker could be persuaded to render a fairness opinion, under Defendants' reading the General Partner would thereby garner a conclusive presumption of good faith, despite the more specific provisions of Section 7.9 regarding conflicts situations. Those provisions, of course, offer various safe harbors for the General Partner that provide a rebuttable presumption of good faith. Pursuant to the Defendants' reading, the protection of an independent

---

portion of the applicable LPA. *See In re Kinder Morgan, Inc. Corporate Reorganization Litig.*, 2015 WL 4975270, at *6 (Del. Ch. Aug. 20, 2015), *aff'd sub nom. Haynes Family Trust*, 135 A.3d at 76.

[118] *See Dieckman*, 155 A.3d at 366.

Conflicts Committee, vigorously reviewing the transaction and bargaining on behalf of the unitholders, *or* of a *majority* approval of un-conflicted common units, would result in only a rebuttable presumption. By contrast, a process where those unitholder protections were *absent* would result in a higher irrebuttable presumption of good faith, conditioned solely on the General Partner's reliance on a banker opinion it reasonably believed was within that banker's field of competence. That, to my mind, is an unlikely result, and one which the unitholders would not expect based on a reasonable reading of this LPA, as structured. Further, I note that, as was the case here, it is common practice for special committees of this sort to retain professional counsel and advisors: to the extent SEP GP intended such retention to invoke thereby a conclusive presumption, the LPA could have easily been drafted to include a conclusive presumption in the conflicts section.[119] It was not, however.

Finally, I note were this LPA read to attach the conclusive presumption, it may be necessary to revisit the implied covenant claim which I reject below in light of my finding that only the rebuttable presumption attaches and there is therefore no gap to fill.[120]

---

[119] *See, e.g.*, *TC Pipelines*, 2016 WL 2859790 (relying on conclusive presumption where it was included in the conflicts section).

[120] *See Gerber*, 67 A.3d at 420 (accepting the attachment of a conclusive presumption, but finding such presumption does not bar claims under the implied covenant); Nov. 15, 2016 Oral Argument Tr. 65–66 (indicating on behalf of the Plaintiff that the Court only need reach the implied covenant claim if it constructs the LPA to attach the conclusive presumption under Section 7.10).

31

### 3. The Complaint Rebuts the Presumption of Good Faith

The Plaintiff concedes that Special Approval as defined by the LPA was received, and that no procedural barriers prevent it from attaching.[121] Therefore, a rebuttable presumption that the approval of the Transaction was made in good faith attaches under Section 7.9(a), and the burden is on the Plaintiff to rebut that presumption.

While the Plaintiff may ultimately face difficulty overcoming the presumption of good faith supplied by the Conflicts Committee's approval, that is not the standard he faces here on a 12(b)(6) motion. To defeat this motion, the Complaint must plead facts making it reasonably conceivable that a set of circumstances exist upon which he could recover upon a developed record. Here, the Plaintiff alleges that the Transaction was approved in the face of a half-a-billion—*one-third*—gulf in value, and the concomitant implication that approval was in bad faith. For the reasons below, this apparent valuation gulf, on the facts pled here, gives rise to a pleading stage inference of subjective bad faith.

The Plaintiff relies on his allegations that the Conflicts Committee (1) was "constrained" by the net cash neutral mandate in the Written Consent and (2) relied on a "fatally flawed fairness opinion in approving a manifestly unfair transaction"

---

[121] *See, e.g.*, Pl's Answering Br. 30–31; Nov. 15, 2016 Oral Argument Tr. 31.

to rebut the presumption and state a breach of the LPA claim.[122]  Resolution of this issue requires an answer to the first-order question of what needs to be pled in order to overcome a contractual presumption of good faith.  Section 7.9(b) of the LPA defines "good faith" to mean that the person "must believe that the determination or other action is in the best interests of the Partnership."[123]  Our Supreme Court has made clear that "believe," as opposed to "reasonably believe," imports a subjective standard.[124]  Accordingly, a successful rebuttal, at this stage, depends on the Plaintiff pleading facts to support an inference that the Committee or SEP GP did not *subjectively* believe that the Transaction was in the best interest of SEP.[125]

Our Supreme Court has recognized that it is virtually impossible, especially at the pleading stage, to "peer into the hearts and souls of directors to determine their subjective intent with certainty."[126]  "Therefore, objective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting that belief."[127]  Moreover, where, as here, the LPA specifically provides a definition of "good faith," the Court will construe the term consistently throughout the contract and need not look to "extra-contractual notions

---

[122] *See, e.g.*, Pl's Answering Br. 30–31; *see also id.* at 21–27.
[123] LPA § 7.9(b).
[124] *See Allen*, 72 A.3d at 104.
[125] *See id.*; *see also* Nov. 15, 2016 Oral Argument Tr. 31:16–22.
[126] *Allen*, 72 A.3d at 106 (internal quotation marks omitted).
[127] *Id.* at 107.

of waste and a heightened pleading burden to plead bad faith."[128]  The burden of pleading subjective bad faith, however, remains high.[129]  Quibbles with a valuation methodology, alone, are not sufficient.  However, when the well-pled allegations of the Complaint show that an asset's market value is $1.5 billion, specific allegations demonstrate that the General Partner and its Conflicts Committee knew of that implied value, and the Complaint alleges that the asset was surrendered for less than $1 billion in consideration, subjective bad faith can be inferred at the pleading stage.[130]  For that reason, as discussed below, Defendants' Motions on Count II are denied.

I first address the Plaintiff's argument that focuses on the "net cash neutral" language that appears in the "WHEREAS" recital in the Written Consent.  This argument is a *non sequitur.*  The recital states, in part, that "the Company has received a formal non-binding proposal from Spectra Corp in which Spectra Corp has proposed that the Partnership transfer its membership interests . . . to Spectra

---

[128] *See Brinckerhoff V*, 2017 WL 1046224, at *14 (reaffirming principle to interpret the definition of good faith consistently throughout the LPA and abrogating previous decision that created a heightened pleading standard of bad faith based on an exculpatory provision).

[129] *See Allen*, 72 A.3d at 106–07.

[130] *See id.* at 107 ("Pleaded facts indicating only that a transaction's terms fell below an objective standard of reasonableness are logically relevant to analyzing whether a Defendant satisfied the LPA's subjective standard.  But, they *are neither necessary nor sufficient* to justify a reasonable inference that the Conflicts Committee did not act with subjective good faith.") (emphasis added); *see also id.* ("It may also be reasonable to infer subjective bad faith in *less egregious transactions* when a plaintiff alleges *objective facts* indicating that a transaction was not in the best interests of the partnership *and that the directors knew of those facts*.") (emphasis added).

Corp in exchange for certain consideration . . . with the aim of holding the Partnership *net cash neutral* (the 'Transaction')."[131]  My reading of this recital is that the language seeks only to describe *SE Corp's* goal in the proposed transaction, or describe its initial proposal, and does not limit the Committee's discretion in considering the Transaction.  The Committee's *authority* is specifically delineated in the "resolution" part of the Written Consent, which explicitly provides that the Committee "shall have *all requisite authority of the Board*" in taking actions, "all as the Conflicts Committee deems to be *in the best interests of the Partnership*."[132]  I find it unreasonable to infer subjective bad faith based on the descriptive recital,[133] where the operative portion of the agreement grants appropriate authority.

I turn to the Plaintiff's second argument, concerning the purported valuation gulf.  The Plaintiff argues that the Committee's reliance on Simmons' "fatally flawed" opinion and approval of a transfer of assets to SE Corp worth "at least $1.5 billion" at less than a billion dollars should create a reasonable inference that the Committee acted in subjective bad faith.[134]  Specifically, the Plaintiff relies on the following characterizations of the Complaint as supportive of an inference of bad faith:

---

[131] David Aff. Ex. 2 at 1 (emphasis added).
[132] *Id.* at 2 (emphasis added).
[133] *See Perlegos v. Atmel Corp.*, 2007 WL 475453, at *17 (Del. Ch. Feb. 8, 2007) (indicating recitals are generally not considered part of the operative resolution).
[134] Pl's Answering Br. 19–20.

- That SE Corp announced prior to securing ownership in the underlying assets "that it would be matching Phillips 66's $1.5 billion cash contribution with a contribution of 'its' interest in Sand Hills and Southern Hills before it had obtained those assets;"[135]

- That the initial proposal by SE Corp for the transaction stated that the consideration it would provide consisted of "(i) the return of 20 million SEP limited partner units and (ii) the waiver of its right to receive up to $4 million in IDRs per quarter for twelve quarters" and was silent regarding "'Reduced GP Cash Flow' as an element of consideration;"[136]

- That Simmons, the financial advisor, allegedly flip-flopped in including "'Reduced GP Cash Flow' as an element of consideration" in its presentations to the Conflicts Committee;[137]

- That both Simmons, and the Conflicts Committee, as well as the market generally, knew that "that SE Corp would immediately flip the Sand Hills and Southern Hills Assets to DCP in a transaction that undisputedly valued those assets at $1.5 billion," but for purposes of the fairness opinion, "Simmons used a valuation range of only $950 million to $1.15 billion for the Sand Hills and Southern Hills Assets; and"[138]

- That Simmons then calculated the value of "'Total LP Consideration flowing to SEP in the Transaction at just $946 million, consisting of $904 million for Redemption of LP Units and $42 million for the IDR Give-Back" excluding the "Reduced GP Cash Flow" as an actual element of consideration.[139]

Essentially the factual allegations in the Complaint raise an inference of a gap in actual consideration of $500 million or one-third of the assets' value.

---

[135] *Id.* at 18 (citing Compl. ¶¶ 2–3, 32–34, 58).
[136] *Id.* at 18–19 (citing Compl. ¶ 34).
[137] *Id.* at 19 (citing Compl. ¶¶ 34, 44).
[138] *Id.* (citing Compl. ¶¶ 48–49); *see* Compl. ¶ 60.
[139] Pl's Answering Br. 19 (citing Compl. ¶ 50).

The parties heavily dispute the existence of the alleged $500 million gap in the value of consideration.[140] The Plaintiff argues that the value of the pipeline assets exceeds the value of consideration to SEP comprised solely of the LP Unit Redemption, GP Unit Redemption, and the IDR Give-Back by more than $500 million.[141] According to the Plaintiff, adding "Reduced GP Cash Flow" as an element of value received is unsupportable. He views the potential to avoid future payments to the General Partner as simply a mathematical consequence of "transferring [productive] assets out of SEP and to SE Corp."[142] It would be absurd, he argues, to treat such Reduced GP Cash Flow as *consideration* because it is nothing but an "*impact* of the Transaction on the distribution rights of SEP GP."[143] Accordingly, the Plaintiff would exclude the Reduced GP Distributions in calculating the *value* of consideration to SEP. I note that it is undisputed that the consideration *paid* (actually exchanged) in the Transaction was around $900 million. The dispute is whether the *value* of the consideration should include purported Reduced GP Distributions of approximately $500 million, and (to a lesser extent)

---

[140] I note that SEP GP agrees that the Reduced GP Distributions were not "consideration" actually tendered but argues that they must be viewed as part of the "value of consideration." *See* Nov. 15, 2016 Oral Arg. Tr. 13:6–24.

[141] Pl's Answering Br. 23–24.

[142] *Id.* at 24–25.

[143] *Id.* (emphasis added). The Plaintiff analogizes the Reduced GP Distributions to a taxpayer's savings on future tax payments due to being fired from a job, and argues that the same mathematical consequence would have been recognized by simply giving the assets away for free. *Id.* at 25–26.

Simmons' valuations of the pipeline assets at approximately $500 million less than market value implied by the Joint Contribution.

SEP GP counters that the pipeline assets were "burdened with the IDR Obligation" and therefore "would have a greater value to DCP than" to the limited partners of SEP.[144] The Defendants' position, as I understand it, can be summarized as follows: The Partnership, SEP, did not own an unburdened interest in the pipeline assets. Instead, the Partnership only possessed (and ultimately transferred to SE Corp) the pipeline assets *minus* the contractually obligated future IDR payments to SEP GP (and consequently to its ultimate parent SE Corp). The latter right to the IDR payments, in Defendants' view, was a part of the pipeline assets effectively retained by SEP GP in the initial drop down transaction from it to the Partnership.[145] In other words, even if the Plaintiff were correct that the pipeline assets could be valued at $1.5 billion in an unrelated third party transaction, SE Corp did not obtain a $1.5 billion asset, it only acquired the Partnership's *burdened* one-third share of the pipelines, the value of which must be calculated by deducting the negative value of the IDR burden. SEP GP's view of the Transaction thus implies a fair exchange with no significant gap in consideration. I note that this is a simplified version of

---

[144] SEP GP's Opening Br. 27–28.
[145] *See id.* at 26–28 (arguing that "[i]n a drop down transaction, the general partner through its IDRs retains a portion of the value of the assets in the form of future cash flows from the asset. Essentially, the limited partnership does not pay for the entire value of the asset at closing because it obtains the asset burdened by the continuing IDR obligation.").

the Defendants' argument as to value of the assets to the Partnership, and that the Defendants' characterization is not entirely clear to me.[146]

This recitation should serve to illustrate the complexity of the consideration and Transaction that occurred. This is a motion to dismiss pursuant to Rule 12(b)(6). The record is insufficient to determine the nature of the alleged IDR savings from the sale of Sand and Southern Hills and whether it was properly understood as value of consideration to SEP. Drawing all reasonable inferences in favor of the Plaintiff, as I must, he has made adequate allegations showing that under reasonably conceivable circumstances a facially unreasonable gap in consideration exists sufficient to infer subjective bad faith. In other words, in authorizing a self-dealing transaction in which the General Partner seized (on behalf of its parent) a Partnership asset, which it knew was worth $1.5 billon, in return for a payment of less than $1 billon, it is reasonably conceivable that the General Partner acted in subjective bad faith.

The Plaintiff has sufficiently pled the market, DCP, and Phillips 66 valued the pipeline assets at $1.5 billion.[147] The Complaint also includes references to DCP's

---

[146] *See id.* at 23–26. Here, SEP GP argues that the Reduced GP Distributions were a product of "cancellation of the limited partner units," not removal of the pipeline assets. *See id.* at 25; Nov. 15, 2016 Oral Arg. Tr. at 13:16–24, 20:14–18. Specifically, SEP GP explains that the cancellation of LP Units would affect the "contractual formula used to calculate the amount of Available Cash being allocated to the holder of the IDR under the waterfall provisions of the LPA." SEP GP's Opening Br. 25–26. Thus, contrary to the Plaintiff, SEP GP indicates that the IDR Savings are *not* directly related to the removal of the assets. *But see* Compl. ¶¶ 42, 43 n.3.

[147] *See* Compl. ¶¶ 3, 58.

investor presentation and a Fitch Ratings article in which the Joint Contribution consisting of the pipeline assets and $1.5 billion cash was valued at $3 billion.[148] Similarly, the Complaint references SE Corp's CFO describing the assets as "matching" the $1.5 billion cash contribution.[149] Therefore, at the pleading stage, it is reasonable to infer that the value to SEP of the pipeline interests transferred to SEP GP was approximately $1.5 billion.

The Plaintiff has pled facts from which a reasonable inference can be drawn that the Transaction was made in subjective bad faith. Whether the half-billion gap in consideration is true or illusory, and the state of mind of those acting on behalf of the General Partner, await factual development.

*B. The Implied Covenant Claim*

Regarding the implied covenant claim, the Plaintiff argues that he has asserted an actionable claim on the basis that the Conflicts Committee was improperly constrained and relied on Simmons' flawed opinion. The implied covenant of good faith and fair dealing cannot be disclaimed and inheres in every contract.[150] Here, however, the Plaintiff conceded at oral argument that if the rebuttable presumption attached rather than the conclusive presumption, his claims under the implied

---

[148] *Id.* at ¶ 3.
[149] *See id.* at ¶¶ 3, 58.
[150] *See Brinckerhoff V*, 2017 WL 1046224, at *7 ("The drafter cannot, however, disclaim the implied covenant of good faith and fair dealing.") (citing 6 *Del. C.* § 17–1101(d)).

covenant would be moot.[151]  This concession was apt: if the transaction is subject to review under the rebuttable presumption there is obviously no gap to fill in the LPA, and here there is no work for the implied covenant to do in light of my construction of the contract.  The implied covenant claim is therefore dismissed.

### C. The Tortious Interference Claim

Count VI alleges tortious interference by SE Corp with the LPA.[152]  The elements of a claim of tortious interference with a contract are well-established.  The Plaintiff must plead that there was: "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[153]  Further, when the allegations involve a parent and an affiliate there is a limited "affiliate privilege" which attaches and a plaintiff must plead facts to create an inference of "malice or bad faith" by a parent.[154]  On this motion to dismiss, I must examine the Complaint

---

[151] *See* Nov. 15, 2016 Oral Argument Tr. 65–66 ("The implied covenant issue only applies if you get to a conclusive presumption.").

[152] Count VI also alleges that SE Corp interfered with the General Partner's obligation to comply with the implied covenant of good faith and fair dealing.  Since I have found that the implied covenant is inapplicable here, I need not consider this allegation of Count VI.

[153] *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del. Ch. 1987) (citations omitted).

[154] *See Renco Grp, Inc. v. MacAndrews AMG Hldgs LLC*, 2015 WL 394011, at *9 (Del. Ch. Jan. 29, 2015); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006) (observing that "the test for holding a parent corporation liable for tortious interference had to be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases").

41

to see if the allegations, if true, make it reasonably conceivable that tortious interference with the LPA occurred.

The Plaintiff cites two ground for imposing liability on SE Corp for tortious interference, one specific and the other more general. The specific ground is easily dispensed with. The Plaintiff contends that "SE Corp introduced the improper constraint on the Conflicts Committee" via the "net cash neutral" recital.[155] As detailed previously, the resolution referring the matter to the Conflicts Committee recited in the "WHEREAS" clause that SE Corp's proposal was for the Transaction to represent a "cash neutral" exchange. For the reasons explained above, the "WHEREAS" clause provisions, including the recital, did not constrain the Committee; the challenged recital merely described the terms of the initial offer and did not trump the operative charge to the Committee, which required a determination in the best interest of the Partnership. Further, even if the WHEREAS clause were improper, the well pled allegations of the Complaint do not support the inference that the Board of SEP was acting on SE Corp's behalf or under its direction when it drafted the (arguably improper) resolution creating the Conflicts Committee of independent directors.

---

[155] *See* Pl's Answering Br. 46 (citing Compl. ¶¶ 15–18, 34–36); *see also* Nov. 15, 2016 Oral Argument Tr. 66:8–14 (arguing on behalf of the Plaintiff regarding the tortious interference count that "[t]he one allegation we have is that they designed this as a transaction with a goal to be net cash neutral, and that we say was passed through to the resolution under their capital T transaction, and that was what constrained the special committee as to what they were allowed to consider because that's what the resolution says").

42

The more general allegation is that SE Corp structured and participated in the Transaction, which it knew was not in the Partnership's best interest. It thus knew that approval of the Transaction required a breach of the contractual good-faith obligation of the General Partner. This argument is facially appealing: I have already found that the delta between market value and the consideration for the Transaction is sufficient to imply bad faith on the part of the General Partner; those facts regarding value were known to SE Corp at the time it made the initial offer and when the Transaction was consummated. SE Corp had created the Partnership, and was thus aware that the General Partner's contractual obligation was good faith. But for the offer by SE Corp, under this theory, the breach would not have occurred.

On reflection, this theory is flawed. The LPA was designed to permit conflicted transactions of just this type. There was no obligation, contractual or otherwise, prohibiting SE Corp from offering to purchase Partnership assets; in fact, the LPA provided a specific procedure for just such proposed conflicted transactions. The General Partner proceeded in a way consistent with that contractual procedure, appointing the Conflicts Committee. The Committee ultimately approved the transaction, and the General Partner adopted the Committee's recommendation and closed the Transaction. The burden thus shifted to the Plaintiff to rebut the presumption of good faith; I found the gulf between market and transaction price—

43

as known to the General Partner—to be sufficient, at this pleading stage, such that subjective bad faith on the part of the General Partner is reasonably conceivable.

In other words, the offer started this chain of events, but does not of itself imply intention to cause a breach, nor was it a significant cause of the breach. In fact, the offer was consistent with the LPA, and it was up to the General Partner to accept or reject the offer, contractually limited by a subjective good faith belief that its actions were in the best interest of the Partnership. One can easily posit scenarios where SE Corp could have intruded on the Conflicts Committee or the General Partner in a way that caused or facilitated bad-faith capitulation to the offer. Nothing of the sort is alleged here. The Complaint is silent, aside from general allegations that SE Corp "orchestrated" the Transaction, as to any act by SE Corp, other than making the offer and negotiating with the Conflicts Committee. Again, those actions are specifically contemplated in the LPA. The pleadings stage record before me does not contain alleged facts sufficient to state a claim of tortious interference with contract. Therefore, Count VI must be dismissed.

Because the issue is not before me, I have not considered here whether an amendment to the Complaint to state an unjust enrichment claim against SE Corp is warranted.

## III. CONCLUSION

For the foregoing reasons the Defendants' Motions are granted in part and denied in part consistent with this Memorandum Opinion. The parties should submit an Order consistent with this decision.